Number 3, 17-0735, people of the state of Illinois, comments by Jerry Domenovic v. Peniel Alate, affidavit by Jerry S. Myles. Please proceed. I haven't seen you for a while. And I haven't seen you for a while. Just a month. That's a good thing. Mr. Clark, counsel. This morning in the state of Illinois, dealing with a summer suspension. Please allow me to say this. With this particular case, there are two aspects involved. The trial judge in this case ruled that the officer lacked reasonable grounds for the stop and the lack. So, there are actually, the trial judge ruled on both the stop and the probable cause for the arrest, which are both aspects in a summer suspension that can be attacked. So, what I did is, I... What happens if the stop is wrong? If the stop is wrong, then you don't have to go on to the next one. We're done. And so, which is the reason why I have argued that aspect of it, aside from the fact that I didn't have to argue the reasonable grounds for the stop would have been afterwards. So... In the trial judge's decision in stating that there was a lack of reasonable grounds for the stop, that's an off-standard. Reasonable grounds for the traffic in Illinois is the equivalent of probable cause in a criminal-type situation. The basis for a traffic stop is reasonable suspicion of a terrorist. And when you just look at those facts alone, then you have... We feel as though you have a basis. Now, there's a case out there that says that the trial judge had... I'm sorry to interrupt your argument. Go ahead. But did anyone file a certificate for impairment? Anyone? Sometimes it was an on-the-nose appeal. I don't... In this particular case, I do not know. But I don't think, in this case, the state has to file a certificate of impairment because this is more of a... It's not criminal, sir. It's more of a civil appeal. In a criminal case, this is more of a civil appeal. So it would be necessary to file a certificate? I don't think it would be necessary to file a certificate of impairment. Because I don't assume impairment is when evidence is being suppressed or, you know, something is being... a charge is being thrown out. So because this is not the... Because of the nature of this... Decision. Decision aspect, there's no freeze-due of that kind of requirement? We believe so, yes. Okay. Okay? I just want to get that out of the way. Oh, that? Okay. So... There is a case out there that basically says that the trial judge uses the wrong legal standard. That is the basis to reverse. And... However, this court can, of course, decide the case on anything apparent of the record. So if this court were to decide that there was not a basis for the stop, this court can basically say, yes, the trial judge used the wrong standard, but the facts of this case still, nonetheless, support the trial judge's ultimate decision. Are you in favor of this court using that kind of authority? I smile and nod, because basically this is almost like Beijing on the move. I would say yes. I would say yes. And because... You know, in a sense of... Yes, it is a two-edged sword. I honestly can't stand up here and say because of the earlier case I heard, Your Honor, that I made that statement, oh, no, we can't take him to the hearing, Your Honor. I'm not that way. I'm not that kind. So, no, I am in full agreement with this court's annotation. If my analysis is wrong, and what I say is wrong, and this court loses it, then this court should just take the firm. I mean, it's just that way. So... But I think that when you look at the facts objectively, and the things that happened, that the officers at least had a reasonable, particular suspicion. Because in this case, basically, picture in your mind, there's an intersection, and there are three cars. The car in front of the defendant's vehicle, and they have the petitioner, the defendant's vehicle next, and the officer behind him. They all, in the lane, make a left turn. The light turns, the arrows make the left turn. The car in front of the defendant proceeds to make a left turn. The defendant's car just sits there. And doesn't move. The light turns, the green arrow, to red. It then cycles to the red and green. It still sits there for a few seconds, and then takes off, never coming up to the white line, never coming up to the line, just slowing and stopping, and then just goes through the intersection. It may be the turn. There is apparently some sort of a median on this other roadway, and as I'm sure we're all aware, sometimes before the median, there's a little area that has rumble strips on it to let you know that, hey, you're supposed to hire a concrete, or a type of thing that's going to take and cause damage to your vehicle, so I guess I'll cut the corner there. That's sort of unclear, looking at the tape, isn't it? Well, it is unclear, because you're not going to really be able to see, but the officer testified, and I guess if you take a look at the tape, and have an idea of where the rumble strips were, and how the car went, it might be, but I don't think that the tape necessarily shows everything, because especially, the officer says when they make the turn, she made the turn, cut the corner, went wide, and nearly hit the curb on the right-hand side. This is what the officer testified to, and so those were the facts that formulated just the basis for the stop. I submit that those are enough facts to give an officer a reasonable suspicion of something, either texting, or potentially DUI, and the officer did write a ticket for not following the traffic signal, and I'm willing to take and debate that, if the court wants to, but it's just the fact that it's there, and I think that to a large extent, I think the officer, at least in terms of a reasonable suspicion, had a left-turn lane, like the one, and not move at all. Something's going on with the driver. Something's happening. It's not just caution, because when you've got the arrow, you've got the right of it. Now, I realize, I guess I won't get into it, but the defendant has argued that there's a statute that says, oh, when making a left turn, you have to proceed to the intersection cautiously, have to basically yield to the pedestrians, and yield to any other traffic parked at the intersection. Well, the statute says, may turn, you know, and may turn on the green arrow. Well, okay, may turn the green arrow, but I don't even think it says the green arrow. It just says when the traffic patrol provides for a left turn, and I'm thinking to myself, how can you have the green arrow, and have other cars, according to that statute, properly using the intersection? Properly using the intersection is what it says, or where's the other traffic? And the only thing I can think of is the fact that there are, in a lot of cities, there are traffic control devices where after you get the green arrow, it'll cycle to red, and then it'll cycle to green for traffic to go straight, but it'll also give a yellow left caution signal. In other words, you can turn left, but according to that statute, you have to take any cautious, you may turn when appropriate, and you have to take the yield to basically provide for other traffic properly in the intersection. That is what I think that statute is speaking of. The statute before it talks about the fact that when you have a traffic control device, you basically, you need, you should, you shall, follow that device. Follow whatever that device is telling you. So based on that, and based on the nature of the turn, you ought to stop. So on that point, I think that there are sufficient facts to justify the stop. Now we get into the next issue, which is, okay, if we have our typical suspicion to stop, now we have to find reasonable grounds, or otherwise stated, probable cause to believe that that was unusual. Now I am not going to take in and recite with me what the officer testified. Basically, it was standard fields of writing test, had her count backwards, had her basically time, answer certain questions, and based upon her responses, based upon how she reacted, as well as based upon at least what the officer testified he saw, and what I did is, I did, when I was on the team, go through each instance where the officer had testified what he saw. And I wrote down specific times and things like that, where, for example, the defendant stepped off the line, or where she was mistaken. And that, again, is a matter of perception. It is what I perceive. And I submit that there was sufficient facts to believe that the defendant was driving under the influence. And we gave all of that in combination with the preliminary death test, which was .09. I think that there were reasonable grounds. The problem in this case is when the trial judge analyzed it, the trial judge basically said that expressed her personal opinion on how she and certain intersections are clear about how she drives. And, of course, she did go through, and the record is clear. She basically did discount everything that the officer said, discounted everything that was on the tape, basically rejected everything, and realized that creates a credibility question. I think that's a question that basically this court can overturn if reviewing the tape, if this court believes that that decision is manifestly wrong. If reviewing the tape is not a credibility determination, right? I'm sorry? The tape itself is not credibility determination. The tape itself is not. But what I'm talking about is the fact that when the officer testified, he saw what he perceived, I think, is perceived as on the tape. But her finding basically discounts the officer. So the credibility of the officer is what's at issue. Okay? Sure. So, with that said, Your Honor, you would ask this court to reverse the trial judge's finding and do a brief statement. If there are any questions, I would be happy to respond. Thank you, Your Honor. May it please the Court, Scott Iles, on behalf of the defendant, Alice Holt. The issue in this case boils down to the fact that when you have a vehicle stop, which is a pend-off in this case, and we're talking about in the world of a petition to rescind, a statutory sentence suspension, the Fourth Amendment probable cause analysis comes into play. And when you look at the cases that talk about this, the linchpin in most of these cases involving whether or not there's enough or a reasonable suspicion of a traffic stop, the question in turn is, typically, was there some sort of a traffic violation that the defendant did to  of the vehicle? Now, the State's position in this case was that the defendant violated the Vehicle Code, Section 11-305, because she disobeyed a green turn arrow. However, the Vehicle Code is very clear that under Section 11-306 you may turn on a green arrow. The officer in the videotape is parked right behind the defendant. Granted, it's unusual for somebody not to go on a green arrow at an intersection. If you're given a green arrow to go and turn left and you're in the left turn lane, most of the time, people go. However, in looking at the probable cause analysis under the Fourth Amendment, and using Fourth Amendment principles here, and using the test of reasonable suspicion as announced in Terry v. Ohio, the question becomes, was there some reasonable suspicion based on some articulable facts taken together with rational inferences? What do we have that's shown in the videotape which starts this? You have a lady, you have three cars, you have a car before the defendant, you have the defendant's vehicle, and the police officer. The light turns to a green arrow, the first car takes off. The defendant's car skates, does not move. The green arrow turns and it is gone, and then it goes to a solid green. More traffic comes through. Once the traffic coming in the direction has come, then the defendant proceeds to make a left turn. And if you look at the videotape and the trial court in this decision thought that the driving, there was nothing wrong with the driving. In fact, what can be surmised under that analysis? And certainly one possible could be the fact that maybe somehow the defendant is impaired. She wasn't paying attention and she's still out of it, that's why she didn't realize. What's another inference that could be made? Well, she was distracted. She could have been on her phone. She could have been thinking about something. I think it's common sense to say that people get distracted when they're waiting for a light to turn and don't realize that the light changes. Does that, is it just a rational inference just based on that act that in this particular case the defendant was driving under the influence of alcohol or actual physical control of the alcohol under the influence of alcohol? The answer to that question is no. Because there needs to be a lot of other facts taken into consideration to draw that rational inference. What do we have following that? The defendant turns left. Now, if you look at the transcript see he, one of the things that the office says, well you know, the defendant turned into the wrong lane. No. I did a motion, it was granted I think last week, to cite the case that just came down in the 4th District, People v. Walker, that indicates that when you're making a left turn it doesn't matter which lane that you go in. Is it the farthest left lane or the right lane? You do not violate that section. All you have to do is make a safe turn left into either the right or the left lane, going in the same direction. And the court in that case went through a very specific analysis of looking at the statutes to make a determination whether or not a motion to suppress had been granted and was probable. And I thought that was an important case, that's why I asked the court to consider it. If you look at the videotape she turns into the right lane and she's driving fine. The officer is in the other lane, in the left lane, goes up he wants to see if she's on her cell phone. No, he doesn't see that either. He slows down gets behind the defendant and initiates a traffic stop. Now, the trial court made a finding after hearing both the testifying officer and also watching the videotape that there wasn't really any reasonable suspicion to initiate that traffic stop. There was no violation of the vehicle code. This talk about a meeting or run over a meeting, you don't see that in the videotape. You don't hear anything. He, the officer, follows right behind the defendant's vehicle when she makes the turn. Did the officer also violate the vehicle code's action? I don't know. They mention a curb. The prosecution mentions a curb or the officer mentions a curb. Are you talking, is it the driving when she's in the right lane and she gets a little close to the... Yeah, she... Now, is that leading? He didn't say it was leading. He said, well, she got a little close to the curb. And again, when he asks his testimony, he talks about erratic driving. Well, the trial court in the first instance heard both the officer testifying and also viewed the videotape. Now, the trial court, the trial judge is according to great deference in her findings of fact. And the reason for that is that because not only does she see the videotape, she also gets to witness the officer's banner while he testifies. And that's critically important. And in this case, the police officer in this case didn't have any credibility because he was testifying to things that he said happened that were not true. And that's why she felt, the trial court felt that the officer didn't have any credibility. Now, as far as the erratic driving, the trial court found that she didn't hear or see any erratic driving. And the officer was inconsistent because he was called by the defendant and former Judge White conducted the, you know, the direct examination of the officer and there was no talking about any slurring speech when going through that and then when he was cross-examined by the state, all of a sudden this stuff comes up. The trial court found that the officer didn't have any credibility. She stated in her ruling that the officer was testifying about things that occurred that she didn't see in the videotape and felt that he lacked credibility. And that there were no reasonable grounds for the stop or the arrest. I'm not even going to get into the field sobriety test because she made several rulings and findings concerning what she saw on the performance of the defendant during the field sobriety test. And there is a two-thing. You look at the initial stop and you also look at the arrest of the defendant based on her performance on the field sobriety test and everything else. It doesn't, I mean, if you don't get a favorable ruling from us on the stop, don't you have a problem with the PBT? I mean, regardless of all of the other things being subjective in nature, isn't there a problem with that? Doesn't it give a presumption? Well, I think the PBT is one factor among many. I mean, there's a reason why it's not admissible as substantive evidence because generally I think there's some argument in the transcript that talks about this, that they're not really that accurate, that they can be used as one factor among many to determine whether or not there was reasonable grounds to arrest the defendant for the D-1. But you have a lot of other factors that were involved there. For example, her performance on the field sobriety test, if you look at the videotape, followed the directions, kept the leg up, did the counting. She did very well on all the physical manifestations in the field sobriety test given that she also said that she had some difficulty with Lyme disease and some other things she performed those tests rather well. Then you have numbers. The numbers? Of the allegations she missed 40? But she wasn't required to count down to 40? Only 87 to 61? Well, I guess she was counting and the officer didn't stop her. Again, we have to look at what the trial court's factual findings were. And again, I think the case law is relatively clear, not that I don't have great deference to the court, but the trial court, they're the first stop. And certainly the trial court's findings with this regard are a challenge of great deference unless there's something manifestly wrong seen in the videotape. And to the extent that Judge Goodman, who has heard I think she has been in quite a few appeals on petitions where she was the trial court judge that had been in front of this court, I think she does know the appropriate tests in measuring these. We've known it for so long. We only look at one case at a time. And I understand that, but what I do want to emphasize is that one of the state's key points here is that Judge Goodman used the wrong standard in doing this, and I would disagree with that. There's a snippet taken out of the ruling, and if you read the rest of it, she goes on to say that this is, in looking at the assessment under its reasonable grounds of what the tests should have done. I think she did use the appropriate test here. And as far as her findings with regard to the stop and to the other, I think that the state's got the burden here to show that this is, I guess, the manifest way to the evidence, and that's not an easy bar to climb, especially when there's a videotape there that shows no traffic violations in driving, shows a defendant who does well on the physical or the field sobriety test, and where the trial court may be finding that the officer is testifying in his manner, and testifying, but he didn't have any credibility. She goes on several occasions, she says, he's testifying to things that were not on the videotape. I don't know how much more clear that the trial court could make it other than suggesting that the officer was either trying to mislead, or was not being truthful in his testimony. And I think that that finding is in charge of the great deference, according to the Ludeman case in the Supreme Court, discussed as a community caretaking aspect, and the court amendment, trial court findings in this instance, because they saw the officer testify in his manner. And there is some points in the transcript where former Judge White was able to get under the officer's skin a little bit, and I think that that needs to be taken into consideration. Judge Goodman saw that, and when she was making her ruling and her assessment of his credibility, and I think that that goes a long way in stating that the trial court should be a permanent existence. I think the Fourth Amendment to a certain extent, which is part and parcel of what we're looking at here in this case, here we have an instance of somebody driving along, does something I don't want to say unusual, by not taking off when the green arrow gets lit when you're in the left turn lane, I guess that's unusual for that to happen. But do we have to that one instance, that one thing, does that give the ground to perform a seizure under the Fourth Amendment? I say no. You look at the rest of the driving, she turned in the right lane, and I'm sure the records are talking about the curb, but you look at the videotape, and I'm sure you're noticing lots of videotapes, just as I have, it's like Justice Potter Stewart, you know it when you see it. Well, this isn't a pornography, is it? Pardon me? This isn't a pornography case, I missed something if I... Was there something else on the video then? Well, no. I'm just saying that if you look at the driving that's in this case, it's not there. The reasonable seizure is not there. There's no violation of the traffic law, nothing the state could point to, and given the performance in the field sobriety test, even granted there's a PBDT test tonight, and I grant that that is one of many factors that can be taken into consideration, but I would submit to you, as I stated earlier, there's a reason that those tests were not put in at subsequent events, is that they can be inaccurate. They might show the detection of someone having a drink, but not necessarily up to the level. And the defendant in this case did admit to having one drink, but that doesn't go all the way to supporting reasonable grounds under the Fourth Amendment analysis to have a seizure to have the defendant placed under arrest. Ten minutes. I'd ask that the Court affirm the testimony of the defendants on statutory summary suspension. Thank you. Thank you, Counselor. I wish to take a minute to make it very clear that the State is not taking the time to take in and say anything other than the fact that yes, it is a burden. The thing is, the defendant fails to address. The defendant is putting everything together just by saying Fourth Amendment and the cost, et cetera. The thing is, on the stop, it is very important to distinguish the fact that it's reasonably suspicious. And when you look at that, the reason why it's important is because the counselor makes laws that stop that. She could be filing a fingernail, she could be doing something with a purse, she could be doing a multitude of things. Okay? But the thing is, on the standard, the standard is the fact that the officer, when you look at it, the facts are not considered in a moment of hindsight, but from the perspective of a reasonable police officer under the circumstances of the situation. We're talking about the stop. We don't segment it, saying, okay, well she could be doing this here and there. And when she turns, she didn't, she could obviously turn in the right lane. Well, okay, that's all true. But to put it all together, when you're analyzing whether a reasonable police officer would have had a simple fact to make a stop, when there's a green arrow and the person doesn't move, when the light goes, the green arrow is red and that cycles into the green, she still doesn't move. When she makes a little turn, she starts from where she was stopped to begin with, she makes her turn. Now, making a turn, she cut it, according to the officer, not seen on the tape, she cut it short, went off the grumble strips. How many seconds did that happen? I think the officer said a couple seconds. In other words, two, three seconds, she didn't move. Just like this, right? I mean, we see it on tape, boom, boom, like that. And she goes off at a time. Okay, so when you take everything the officer said, from his perspective, the fact that there might be a gazillion reasons why she could have been doing what she did with the green arrow doesn't make any difference. You know, what do you think about the officer's testimony and how it got stranger and stranger as it progressed? I don't know. I mean, things started adding, you know, other things started adding. I don't know. The thing with Wilson is the thing with the... Did that have an impact on the judge's finding about credibility? I'm sure it did. I'm sure it did. But, and I say but, when we get down to the tape, okay, now you're making this final, okay, I'm going to take and tell you what I saw, and I'm going to take and tell you where I saw it. Okay? Now, I could be wrong, but this is what I saw. More so, the THTN test and, of course, the pulmonary breath test and all that, you can't, there's nothing to see. And the officer testifies, my staff testifies, and the PBT, the PBT is what the PBT is. And by the way, there is no evidence in the record that PBT is inaccurate. How that came out was, counsel, the defendant, if you will, presented what I consider to be a kind of a leading question. Well, haven't you heard, officer, that basically PBTs are not admissible because they are inaccurate? And the officer says, I have a verdict about the fact that PBTs are inaccurate or anything like that. That's, I think, the only evidence that we really have on the record concerning the inaccuracy of PBTs. Even though I know they're not admissible, it's all a question of public thought. But, getting back to the test, what would you see at the initial stop? Pardon me? What would you see at the initial stop? I'm sorry? What would you see at the beginning? You're here to tell us what you saw. I'm telling you what I saw. This is with the test. With the Fields of Privacy test. Tell me what you saw in the beginning. In the beginning, I saw a person just sit there. I stopped and there's a name, an arrow, she sits. And how many seconds? I have no idea how many seconds the green arrow lives, I don't know if it's 15 seconds, 20 seconds, I have no idea. She then goes to the green arrow, the green light for traffic to go back and forth. She sits there for a few more seconds and then, without even pulling up the line, just takes off and goes and makes a turn. Makes a turn across the bumble strips, makes a wide turn to the far lane. The officer comes up, by the seat of her phone, goes back, makes a stop. During the Fields of Privacy test, on the walk and turn, on the walk and turn test, at 16.05, I'm going to take, 06, about a second or so, she stepped off the line, taking step number 2. At 16.16 and 16.18, on the 9th step, she stepped off the line and failed to turn as directed. At 16.09 and 16.15, about, you can see that she was swaying or otherwise unsteady. With respect to the one-leg stand test, at 17.40 to 18.12, she starts the test, she raises her right leg and starts to count. At 17.44 to 17.45, on count 1,003 to 1,004, she puts her leg down and she's unsteady. At 17.26, she puts her leg up and you can see that she's unsteady. You know, are any of those tests, I'm just curious now, are any of those tests age-specific or weight-specific? You know, does the test standard change if you're in your 40s, 50s, 60s, 70s? I don't, I have never seen any evidence at all from in cost provided tests. All I know is that they basically, the testimony usually is that these are standardized tests and this is how they're administered, etc. And anything with respect to weight, size, potential physical disabilities, my understanding is that what I have seen this entire time is something that if the defendant does have some sort of a medical condition that somehow... I mean, do you think this might be harder? You know, I'm just curious. Do you think this might be harder if someone's in their 70s to do these tests versus in their 30s? I would say that that is a factor that would factor in. Or 60s. Thank you. Or 60s. I've got a better answer. I've got a better answer if you're better than me. They would pass me flying colors, I would say. I'm not a ballet dancer by any stretch. But if it was a physical condition that I have, which, by the way, you know, I can say I do have a particular physical condition with my back, and if it somehow affected me, what I would do as a defendant, I would bring that medical testimony in. I just wouldn't take it and say, hey, look, I've got a bad leg, I've got a bad back, or I've got a bad distal back, I've got a bad line. You would take it, you know, to take it and do it. Because at this point, in the positions we send, it's her burden to establish the lack of all this. I was supposed to learn as a result my burden to establish that it is. And with that, I would ask this court to reverse. If there are any other questions, I'm going to have to try to respond. Thank you, counsel. Good to see you. Good to see you, counsel. Thank you very much. The court will take this matter under advisement and I'll take brief.